# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | CIVIL ACTION NO. 3:08-CV-1155 |
| v. | (JUDGE CAPUTO) |
| LUZERNE COUNTY, RYAN FOY, in his Individual Capacity, and BARRY STANKUS, in his Individual Capacity, | |
| Defendants. | |

## MEMORANDUM

Presently before the Court is Defendants' Motions for Summary Judgment. (Doc. 45.) For the reasons discussed more fully below, Defendants' motions will be granted.

## BACKGROUND

### 1. FACTUAL BACKGROUND

#### A. September 27, 2007

Plaintiff, Jane Doe, was hired by Defendant Barry Stankus as a Luzerne County Deputy Sheriff in 2002.[1] (Doe Dep. 13:7-16, July 8, 2009). On September 27, 2007, Plaintiff was attempting to execute a bench warrant from a county judge. (Doe Dep. 24:19-25:25.) On that day, Plaintiff and Deputy Brian Szumski entered a residence that "was in total disarray" and discovered upon exiting the residence that they had been infested with fleas. (Doe Dep. 34:15-37:2.) Plaintiff and Szumski later contacted the sheriff's base and alerted the base that they had become contaminated with fleas. (Doe Dep. 38:25-39:1.)

---

[1] Defendant Stankus was the Luzerne County Sheriff on September 27, 2007; he is no longer in office. (Stankus Dep. 48:22, July 9, 2009).

Plaintiff and Szumski were told to go to the Luzerne County Correctional Facility. (Doe Dep. 42:13-15.) When they arrived at the Correctional Facility, Plaintiff and Szumski exited their police cruiser and took off their uniform shirts, bulletproof vests, and duty belts because it was a very hot day. (Doe Dep. 43:11-16.) Plaintiff and Szumski were contacted by Chief Deputy Arthur Bobbouine who told them to stay in the car until he could contact the jail to arrange decontamination; Bobbouine called them back shortly thereafter and informed them that the jail would not take Plaintiff and Szumski. (Doe Dep. 44:12-45:17.)

Plaintiff and Szumski were then directed to go to the emergency management building ("the EMA building") by Bobbouine. (Doe Dep. 46:5-13.) Bobbouine told them to stay in the car and the he would be arriving shortly; Bobbouine arrived approximately twenty minutes later with Defendant Deputy Chief Ryan Foy, Deputy Erin Joyce and Deputy Michael Patterson. (Doe Dep. 47:14-48:18.) When Foy and Bobbouine got out of the car they were laughing at Plaintiff, and Foy began videotaping Plaintiff and Szumski. (Doe Dep. 48-22-25.) Defendant Stankus testified that he ordered Foy to videotape the decontamination for training purposes. (Stankus Dep. 16:17-19, July 9, 2009.) Several people deposed, including Stankus and the Plaintiff, testified that this was the second time in recent memory that a deputy had become infested with fleas in the course of their duty. Bobbouine stated that he was not ordered by Stankus to videotape and was not aware if Stankus had ordered Foy to videotape; he further testified that he did not direct Foy to videotape. (Bobbouine Dep. 16:1-17:2, July 9, 2009.) Foy claims that Bobbouine told him to tape for training purposes. (Foy Dep. 9:12-15, July 9, 2009.) Plaintiff testified that she had no knowledge whether or not Foy had, in fact, been ordered to videotape for training purposes. (Doe Dep. 90:10-12.) Ultimately, no training video was ever made from this footage. (Stankus Dep. 16:13-16.)

2

Plaintiff and Szumski asked to exit the vehicle, but were told to stay in the car lest they infest the others with fleas as well. (Doe Dep. 50:3-5.) According to Plaintiff, it was Bobbouine and Foy who told her to stay in the vehicle, and Foy issued a direct order to her to stay in the car. (Doe Dep. 50:22-24.) As Plaintiff and Szumski sat in the police cruiser, EMA employees attempted to construct a decontamination shower out of PVC pipes outside the EMA building. (Doe Dep. 53:19-54:8.) The EMA employees' attempts to construct the shower were unsuccessful; Plaintiff and Szumski were waiting in the vehicle for between one and two hours while the decontamination shower was being unsuccessfully erected. (Doe Dep. 60:22-62:2.) Plaintiff testified that she became angry with the length of time she was in the car and asked to go home so that she could decontaminate herself, but was given a direct order by Foy and Bobbouine to stay in the car. (Doe Dep. 68:11-21.) While Plaintiff and Szumski were waiting for the shower to be put together at the EMA building, Bobbouine sent another deputy to purchase products to remove the fleas from the bodies and hair of Plaintiff and Szumski. (Doe Dep. 65:20-66:17.) During this time, Defendant Foy was intermittently taping the situation. (Doe Dep. 71:13-25.)

After it became clear that the attempts to construct a decontamination shower at the EMA building were unsuccessful, Plaintiff and Szumski followed Patterson, Bobbouine, Foy, and Joyce to Mercy Hospital while Foy videotaped the ride.[2] (Doe Dep. 73:16-74:18.) Upon arriving at the hospital, Plaintiff and Szumski parked and Plaintiff was told to stay in the vehicle, which she did for forty-five minutes while Szumski was decontaminated. (Doe Dep.

---

[2] Mercy Hospital's name was changed to Geisinger South by the time depositions were taken in this case, and is referred to as Geisinger South in much of the deposition testimony. (Doe Dep. 73:16-25.)

75:22-76:10.) When Szumski finished showering, Plaintiff was directed to take off her boots, socks, and any items of clothing or jewelry that she did not need to bring into the hospital. (Doe Dep. 80:19-81:2.) As Plaintiff began walking toward the hospital entrance, she noticed Defendant Foy taping her and yelled for him to turn off the camera. (Doe Dep. 87:22-88:8.) Foy gestured at Plaintiff to be quiet, laughed at Plaintiff and told her that the video was for training purposes; this was the third time during the day that Foy told Plaintiff that he was videotaping for training purposes. (Doe Dep. 89:12-24.) Before Plaintiff entered the door to the hospital she was met by Deputy Joyce,[3] who gave Plaintiff a blanket and told her to wrap the blanket around her head so that no fleas would jump off her body and into the hospital. (Doe Dep. 92:12-18.)

Plaintiff then entered the hospital vestibule wearing the blanket, work pants, and a tee shirt. (Doe Dep. 98:4-12.) Plaintiff entered the decontamination shower wearing this clothing. (Doe Dep. 102:23-25.) Deputy Joyce stood with her foot in the doorjamb with the door open approximately two inches and read Plaintiff instructions from the products that had been procured to accomplish the decontamination. (Doe Dep. 103:2-104:25.) Plaintiff was still fully clothed while Joyce read the instructions and did not disrobe until she was alone in the shower room; the door to the decontamination shower was a "heavy wooden door." (Doe Dep. 102:15-16,109:13-19.)

After she had finished showering, Plaintiff asked, through the wooden shower door, if there were any towels and was informed that she would have to use the drying materials provided in the decontamination shower, which Plaintiff testified were "paper sheets, almost

---

[3] Deputy Joyce is female. (Doe Dep. 94:12.)

4

like when you're at a doctor's office and you sit on their bed, the paper that is down." (Doe Dep. 112:12-113:5.) Joyce then asked if Plaintiff had wrapped herself in the materials provided and was "decent" before telling her that she would have to come in to make sure that all of the fleas were out of Plaintiff's hair. (Doe Dep. 113:11-18.) Plaintiff then stepped away from the door and Joyce stepped completely into the shower room, closing the door behind her. (Doe Dep. 113:18-23.) While Joyce checked Plaintiff's hair to make sure that the fleas had been killed by the shampoo, Plaintiff stood with her back towards the door. (Doe Dep. 115:12-18.)

As she stood with her back towards the door in the shower area, she heard a male voice ask "what's that s - - t all over your back?" (Doe Dep. 115:18-20.) Plaintiff identified the voice as Bobbouine and, thinking that he was referring to fleas, brushed at her back, without turning around at any time. (Doe Dep. 116:4-9.) Foy then commented that the matter that caught Bobbouine's eye were tattoos on Plaintiff's back, and then Foy and Bobbouine commented on the tan lines on Plaintiff's back. (Doe Dep. 116:13-16.) Plaintiff yelled for Foy and Bobbouine to leave the shower area; Joyce also yelled at them, Plaintiff heard the door close, and Joyce assured Plaintiff that Foy and Bobbouine were gone. (Doe Dep. 116-18-117:21.) Plaintiff testified that during this time she never turned around, had her back facing Foy and Bobbouine the entire time, and she only saw them out of the corner of her eye as she tried to brush fleas off her back after Bobbouine commented on her tattoo. (Doe Dep. 116:19-22.) During the time Joyce was in the shower area with Plaintiff, Plaintiff was wrapped in the paper described above; the paper covered Plaintiff from the middle of her chest, past her genitals, to her thigh; a large portion of her back, legs and shoulders were left exposed. (Doe Dep. 122:22-124:7.) Plaintiff stated that, to the best of her knowledge, her

5

"private areas" were covered by the paper wrap, but that she could not tell if it was see-through because her eyes were being affected by the flea shampoo. (Doe Dep. 123:1-124:23.)

Deputy Joyce then left the shower and tried to find Plaintiff some clothes to wear. (Doe Dep. 119:1-3.) When Joyce came back, she asked Plaintiff what size she would take in hospital scrubs, and Plaintiff answered that she would need a medium; after Joyce exited the shower, Plaintiff overheard Foy and Bobbouine comment that "[Joyce] better ger [Plaintiff] a 3X because [Plaintiff] is a little heavy in the rear." (Doe Dep. 119:5-25.) When Joyce came back with the scrubs, Plaintiff stepped off to the side of the door, opened it slightly, stuck her wrist out, and was handed the scrubs by Joyce. (Doe Dep. 120:6-121:9.) Plaintiff then got dressed in the scrubs and exited the shower when she was fully clothed. (Doe Dep. 126:5-6; 135:14.)

Plaintiff and Szumski then rode back to sheriff's office; because their cruiser had to be fumigated to kill any fleas, they were forced to ride in the tailgate of the SUV with Joyce, Patterson, Foy and Bobbouine. (Doe Dep. 147:11-23.) Foy videotaped Plaintiff and Szumski getting out of the vehicle and said something to the effect of "here come the fleabags." (Doe Dep. 147:19-25.) As Plaintiff was in the parking lot to the sheriff's office, she encountered Stankus, who had been laughing with Bobbouine and Foy and, according to Plaintiff, walked by Plaintiff and Szumski without acknowledging them. (Doe Dep. 148:12-17.) Plaintiff was met in the parking lot by Mary Jean Farrell, who had brought clothes for Plaintiff to wear. (Doe Dep. 149:8-10.) Foy and Bobbouine told Plaintiff that she should just go home; Plaintiff went into the sheriff's office bathroom, changed clothes and went home for the day. (Doe Dep. 149:19-150:1.)

6

**B. The Video/Photographs**

At some point after these events, Defendant Foy played the videotape he made for other employees of the Luzerne County Sheriff's Office. (Doe Dep. 138:16-18.) In April 2008, Plaintiff learned from Deputy Mandy Leandri that there was a videotape and screen-shot photographs of Plaintiff on Foy's old computer. (Doe Dep. 140:7-10.) After Foy left office, Leandri was given Foy's old computer; as Leandri was exploring the files on the computer to delete any files she might not need, she came across the video and screen captures of the September 27, 2007 incident. (Doe Dep. 140:14-141:1.) Leandri contacted the new sheriff, Michael Savokinas, who then contacted Plaintiff so that she could see what was on the computer. (Doe Dep. 141:1-24.) Plaintiff testified that there were five or six still photographs and a video clip on the computer. (Doe Dep. 142:4-7.) The video clip showed Plaintiff's bare back; the photos were of Szumski naked from the back, Szumski wrapped in a light cloth that was see-through, Plaintiff and Szumski in the tailgate of the SUV, Plaintiff's bare back, and one of Deputy Joyce combing Plaintiff's hair with Plaintiff's back turned to the camera. (Doe Dep. 142-4-143:24.) None of these photographs or video showed images of Plaintiff with her buttocks, breasts, or vaginal region exposed. (Doe Dep. 144:1-13.) Plaintiff states that the video and images were place on a county-wide server, thereby making them available to any county employee,[4] but she is not sure to whom the files were actually distributed. (Doe Dep. 136:24-137:11.)

---

[4] This testimony is called into doubt by the deposition of Stephen Englot, the county's IT director, who testified that the files were not on a county-wide folder and that files could only be shared on servers within county departments, not between county departments. (Englot Dep. 39:12-15, 49:9-15, Nov. 18, 2009.) However, because this Court must examine the facts in the light most favorable to Plaintiff on summary judgment, we will assume that the images described were, in fact, on a county-wide server.

Leandri testified that shortly after the September 27, 2007 incident, Foy invited several employees into his office to view the tape. (Leandri Dep. 16:8-11, Sept. 7, 2009.) Leandri claims that she went into Foy's office, saw a video clip containing Szumski's naked buttocks, and then walked out, but never saw a video of the Plaintiff. (Leandri Dep. 17:14-16, 19:17.) When Leandri later saw the still photographs on Foy's old computer, the picture she saw of Plaintiff showed Plaintiff's shoulders with a tattoo containing Plaintiff's girlfriend's initials. (Leandri Dep. 20:8-16.)

### 2. PROCEDURAL HISTORY

Plaintiff filed her first Complaint on June 17, 2008. (Doc. 1.) On November 25, 2009, Plaintiff filed a Second Amended Complaint. (Doc. 29.) Plaintiff's Second Amended Complaint brought a claim for relief pursuant to 42 U.S.C. §1983 against all Defendants for violation of the Fourth Amendment and violation of privacy rights pursuant to the Fourteenth Amendment (Count I), and a claim against Luzerne County for failure to train in violation of 42 U.S.C. § 1983 (Count II). In Count I, Plaintiff alleges that "Defendants unlawfully searched and seized video images of Plaintiff" and that Defendants' "actions constitute seizure in violation of the Forth (sic) Amendment to the United States Constitutions (sic) and deprived [Plaintiff] of her right to privacy found in the Fourteenth Amendment."

On December 18, 2009, Defendant Stankus filed a Motion to Dismiss, arguing that Plaintiff's claims against him were time-barred. Both parties submitted deposition evidence with their briefs. As a result, this Court issued an order converting the 12(b)(6) motion into a motion for summary judgment.[5] (Doc. 43.) On March 29, 2010, Defendants filed a second

---

[5] Because this Court reaches its conclusion based on arguments presented in the second Motion for Summary Judgment, it need not reach the issues raised in the previous motion.

Motion for Summary Judgment. (Doc. 45.) The second Motion for Summary Judgment has been fully briefed and is ripe for disposition.[6]

## **LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential

---

[6] Recently, Plaintiff was given the opportunity to provide the deposition testimony of Defendants' expert, Hunter Jones, regarding the computer images. Plaintiff presented this Court with an excerpt of that transcript in order to prove "that the material in question had been widely disseminated." (Doc. 75.) As will be discussed below, the amount of dissemination is not material to the claims asserted in this case.

9

element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### 1. COUNT I

Count I of Plaintiff's Second Amended Complaint brings a claim pursuant to 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage . . . subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

42 U.S.C. § 1983.

Plaintiff brings a claim under § 1983 for violation of her right to privacy pursuant to the substantive Due Process clause of the Fourteenth Amendment and for illegal search and seizure pursuant to the Fourth Amendment.

### A. Fourteenth Amendment Privacy

The boundaries of the right to privacy have not been clearly delineated, but have definitely been extended to marriage, procreation, contraception, family relationships, and child rearing. *Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir. 2000) (citations omitted). The Supreme Court has held that the constitutional right to privacy encompasses an individual's autonomy in making choices about intimate matters and an individual's interest in avoiding the disclosure of highly personal information. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977).

In drawing the line about what type of information is protected from divulgence by the Constitution, the Third Circuit Court of Appeals has held that the federal constitutional right to privacy is much narrower than the right to privacy usually protected by state tort law and "shields from public scrutiny only that information which involves 'deeply rooted notions of fundamental personal interests derived from the Constitution.'" *Nunez v. Pachman*, 578 F.3d 228, 231-32 (3d Cir. 2009) (citations omitted). In order to violate a person's constitutional right to privacy, "the information disclosed must be either *a shocking degradation* or *an egregious humiliation* of [plaintiff] to further some specific state interest." *Id.* at 232 n.8 (emphasis in original).

Although there have been no cases in the Third Circuit that are directly analogous to the case at bar, two opinions from the Ninth Circuit Court of Appeals are instructive. In *York v. Story*, 324 F.2d 450, 452 (9th Cir. 1963), the plaintiff went to the police to file charges for assault, at which point one of the police officers took the plaintiff to a room at the police station, directed her to undress and then "directed [plaintiff] to assume various indecent positions, and photographed her in those positions." The police officer took the photographs despite the plaintiff's protestations that there was no need for her to be nude or assume the

11

positions demanded by the officer because the bruises caused by the assault she was reporting would not show. *Id.* The officer later told the plaintiff that he had destroyed the pictures because they did not come out; the photographs had, in fact, come out and the officer had circulated the pictures among the personnel of the police department. *Id.* The Ninth Circuit Court of Appeals held that the officer's actions constituted a violation of plaintiff's right to privacy, reasoning that "[t]he desire to shield one's unclothed figured from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Id.* at 455.

In *Davis v. Bucher*, 853 F.2d 718, 719 (9th Cir. 1988), the plaintiff, an inmate at a Washington prison, was being scheduled for transfer and had his possessions boxed, including an envelope containing four nude photographs of his wife. The defendant, a corrections officer, removed the photos from the envelope, examined them, and then showed them to two inmates. *Id.* Months later, plaintiff became agitated when defendant attempted to serve a meal to plaintiff's cell; when asked to explain the inmate's reaction, defendant "recounted the photo incident, adding gratuitous derogatory comments about [plaintiff's wife's] anatomy" in the presence of another guard and an inmate. *Id.* The court held that injury suffered by the plaintiff was "not one of constitutional magnitude" and presented "a controversy squarely within the ambit of state tort law protections." *Id.* at 720. The court reasoned that the defendant's "conduct was tasteless, unwise, and unwarranted, but this is not the despicable and outrageous abuse of official power and invasion of carefully guarded personal modesty presented in [*York*]." *Id.* at 721.

The instant case does not fall within the zone of privacy protected by the Fourteenth Amendment. Although the supposed training video was likely ill-conceived and definitely poorly executed, Defendants actions do not rise to the level of a shocking degradation or

egregious humiliation. Like *Davis*, this is the type of "tasteless, unwise, and unwarranted" behavior that is better suited to state tort law, and does not rise to the level of a constitutional violation. For the majority of the time at issue here, Plaintiff was fully clothed; she was fully clothed as she was waiting in her police cruiser and was dressed in hospital scrubs after exiting the shower area.

While in the shower, there is no evidence that creates a genuine issue of material fact from which a reasonable jury could find that Plaintiff's right to privacy was violated. After she had finished showering, Joyce, a female, was sent in to the shower to ensure that all of the fleas had been cleaned from Plaintiff's hair and checked to make sure Plaintiff was "decent" before entering. When the door was opened for a brief period, Plaintiff had her back to the door and any body part in which Plaintiff might have had a "deeply rooted" notion of privacy was covered. Likewise there is no evidence on the record that suggests that any of the video or photographs captured by Defendant Foy exposed any body part that, as a matter of law, is covered by the rubric of privacy rights in the Fourteenth Amendment. The evidence shows that the only body part divulged by Defendants were Plaintiff's back, shoulders, and limbs. These are not body parts whose protection is deeply rooted in fundamental personal interests.

To the extent that Plaintiff is arguing that her right to avoid having her sexual orientation divulged was violated by exposing a tattoo with her girlfriend's initials, that claim also fails. *See Sterling*, 232 F.3d at 196 (holding that one's sexual orientation is an intimate aspect of one's personality entitled to privacy protection). Plaintiff's sexual orientation was not divulged by her tattoo. This case is factually distinguishable from *Sterling*, where police officers threatened to disclose plaintiff's homosexuality to his grandfather, prompting plaintiff to commit suicide. First, the disclosure at issue here involved several letters on Plaintiff's

back, not her sexual orientation. Secondly, there is no evidence in the record from which a reasonable jury could imply that Plaintiff's sexual orientation was disclosed to anybody who was not already aware of her orientation. Thus, from the record in this case, there is no genuine issue of material fact from which a reasonable jury could find that Plaintiff's right to privacy was violated. Summary judgment will be granted in favor of Defendants on this count.

### B.     Fourth Amendment Search/Seizure

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." Normally, the Fourth Amendment requires the government to obtain a search warrant supported by probable cause to search a person. *Wilcher v. City of Wilmington*, 139 F.3d 366, 373 (3d Cir. 1998). However, there are a number of well-established exceptions to the warrant and probable cause requirements, including the so-called "special needs" exception. *Id.* This exception recognizes that there are certain "exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *O'Connor v. Ortega*, 480 U.S. 709, 720 (1987) (internal quotations and citations omitted). In such circumstances, the government need not show probable cause or individualized suspicion, but must only prove that the search or seizure was "reasonable." *Wilcher*, 139 F.3d at 373-74. To determine if a search or seizure is reasonable, the court must balance the "'intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* at 374 (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989)).

In *Wilcher*, the city of Wilmington, Delaware entered into a collective bargaining agreement with the firefighters' union that included provisions for urinalysis to combat drug

use among firefighters. 139 F.3d at 371. The city solicited bids from companies who specialized in drug testing and ultimately accepted the bid of a company called SODAT. *Id.* The process of urine collection employed by SODAT required the SODAT employees to look in the general direction of the firefighters as they commenced urinating, but not to focus on their genitals. *Id.* The district court's finding of facts stated that the urine collection process might have included some observation of the genital area generally, but any such observation was the byproduct of general observation of the donor. *Id.*

In holding that the method employed by the city and SODAT passed constitutional muster, the court stated:

> Because we find that SODAT's direct observation method, as described in the district court's findings of fact, meets the three elements of the Fourth Amendment reasonableness test, we hold that the plaintiffs' Fourth Amendment rights have not been violated. The City's significant interest in preserving the integrity of its firefighters' drug tests outweighs their expectations of privacy. . . . As for the female firefighters, we note the district court's finding that SODAT has taken several steps to minimize the potentially intrusive effects of having a person present in the same room during the collection of a female firefighter's urine. So long as SODAT's monitors refrain from looking at the firefighters' genitalia, its direct observation procedure remains within the boundaries of a constitutional search. Accordingly, the district court did not err when it ruled in the defendants' favor on the issue of constitutionality under the Fourth Amendment.

*Id.* at 378.

This Court begins its analysis by noting that the reasonableness of a search is a matter of law. *Id.* at 373. The instant case falls within the purview of the special needs exception to the warrant and probable cause requirements; although Defendants are involved in law enforcement, they were not acting in their capacity as law enforcement officials when they were trying to decontaminate one the employees of the sheriff's department who had become infested with fleas. Furthermore, this is an exceptional situation where the warrant requirement is functionally impracticable. It would be senseless to require

15

a governmental entity to procure a warrant from a magistrate judge before requiring their vermin-infested employees to be decontaminated. Thus, it is for this Court to determine whether, as a matter of law, the search of Plaintiff was reasonable.

Although the government's interests in this case, namely preventing the present and future spread of flea infestation, was less important than the one at issue in *Wilcher*, so too was the intrusion on Plaintiff's Fourth Amendment interests. In this case, the record shows that both the method of the intrusion and the nature of the intrusion were not as invasive as the method and nature of the direct observation urine collection at issue in *Wilcher*. There is no genuine issue of material fact on the record that a reasonable juror could rely on to find that Defendants saw Plaintiff's genitalia. When Joyce entered the shower area to check Plaintiff's hair, she did so while Plaintiff had covered up her genitalia. When Defendant Foy videotaped Plaintiff she was either fully clothed or had her genitals covered with her back toward Foy. Moreover, to the extent that Plaintiff is challenging the distribution of the photographs or video here, those challenges are not appropriately made in the context of the Fourth Amendment, but rather must be dealt with under the privacy context discussed above. *See York*, 324 F.2d at 454 (noting that distribution of nude photographs of plaintiff must be addressed through right to privacy and "could hardly be characterized as unreasonable searches").

On balance, then, the search at issue here was a reasonable one, as the Defendants' need to maintain a workplace free of flea infestation both at the time of this circumstance and in the future outweighed the intrusion of Plaintiff's Fourth Amendment rights by being videotaped and checked by a fellow female deputy in a manner that did not expose her genitals. Therefore, the Plaintiff's Fourth Amendment rights were not violated and summary judgment will be granted in favor of Defendants.

**2. Count II**

In Count II, Plaintiff brings a cause of action against Luzerne County based on a failure to train theory. Municipal liability can be predicated on a failure to train. In order to impose municipal liability, a plaintiff must identify a municipal "policy" or "custom" that caused the plaintiff's injury. *Monell*, 436 U.S. at 694. "Where, as here, the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999). As the U.S. Supreme Court has explained, only in circumstances exhibiting deliberate indifference "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

For a failure to train to amount to deliberate indifference, "it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id*. This third prong, stated another way, requires a causal nexus, in that the "identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) (citations omitted).

In the instant case, there was no ultimate constitutional injury, so there cannot be any claim for failure to train. As such, summary judgment will be granted in favor of Defendant Luzerne County on this count.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. An

appropriate Order follows.

August 31, 2010 /s/ A. Richard Caputo
Date A. Richard Caputo
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | CIVIL ACTION NO. 3:08-CV-1155 |
| v. | |
| LUZERNE COUNTY, RYAN FOY, in his Individual Capacity, and BARRY STANKUS, in his Individual Capacity, | (JUDGE CAPUTO) |
| Defendants. | |

## ORDER

**NOW**, this  31st  day of August 2010, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED**.

(2) **JUDGMENT IS ENTERED** in favor of Defendants.

(3) The Clerk of Court shall mark this case as **CLOSED**.

                                          /s/ A. Richard Caputo  
                                          A. Richard Caputo  
                                          United States District Judge